IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Theodora Louise Gregorie, ) | Civil Action No. 6:12-3275-DCN-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on May 27, 2009, alleging that she became unable to work on August 3, 2004. The application was denied initially and on reconsideration by the Social Security Administration. On July 15, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Kristan V. Sagliocco, an impartial vocational expert, appeared on March

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

21, 2011, considered the case *de novo* and, on April 15, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on September 13, 2012. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant last met the insured status requirements of the Social Security Act on December 31, 2010.

(2)    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 3, 2004, through her date last insured of December 31, 2010 (20 C.F.R § 404.1571 *et seq*).

(3)    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine (20 C.F.R. § 404.1520(c)).

(4)    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except the claimant should have the option to sit and stand at will as part of her job duties, requires the use of an assistance device for prolong (sic) walking, occasionally climb stairs, stoop, kneel, crouch or crawl, and never climb ladders or be exposed to unprotected heights.

(6)    Through the date last insured, the claimant was capable of performing past relevant work as a dispatcher. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

> (7)    The claimant was not under a disability, as defined in the
> Social Security Act at any time from August 3, 2004, the alleged
> onset date, through December 31, 2010, the date last insured
> (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for at least 12 consecutive
> months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. Id. § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of

3

establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 47 years old on her alleged disability onset date and 54 years old at the time of the ALJ's decision (Tr. 33, 54). She attended four years of college (Tr. 33) and has past relevant work experience as a dispatcher and waitress (Tr. 48).

The plaintiff's difficulties with back pain began after an injury in 2000. At that time she kept her pain under control with medications and continued working as a waitress and as a dispatcher for the Highway Patrol (Tr. 30). Treatment notes from July 2004 suggest that she was "well known" at her pain clinic, but that she had "done very well with intermittent epidural steroid injections" (Tr. 302, 358).

On August 3, 2004, the plaintiff was in a motor vehicle accident causing immediate onset of pain in her back and numbness down her right leg. Physical examination showed some dysesthesia in the L5 distribution of her right knee, but she retained full muscle strength, intact reflexes, and normal pulses (Tr. 245). Dr. Scott Strohmeyer of Beaufort Orthopaedic Sports and Spine Center assessed the plaintiff as having acute lumbar radiculopathy and ordered a lumbar MRI (Tr. 245). Dr. Strohmeyer also noted that the plaintiff had undergone a lumbar epidural steroid injection approximately three weeks before her visit and had been doing well until the accident. The MRI, taken on August 11, 2004, showed disc herniation at L3-4, annular tear at L4-5, and stenosis at L4-5 and L5-S1, but was otherwise unremarkable (Tr. 243).

The plaintiff next saw Dr. Strohmeyer on August 12, 2004. He noted that the plaintiff was "in quite a bit of pain in her right buttock and leg down to the ankle on the right side" (Tr. 243). After discussing options with her, the plaintiff decided to proceed with an injection. On August 13, 2004, the plaintiff was given an epidural steroid injection at Beaufort Memorial Hospital, which completely resolved her leg pain (Tr. 242, 299). On

August 30, 2004, Dr. Strohmeyer noted that while she her leg pain had resolved, she was still having significant pain in her back as well as right hip pain, and he started her on a rehabilitation program (Tr. 242).

On September 20, 2004, Dr. Strohmeyer treated the plaintiff and ordered an EMG and another injection.  On September 22, 2004, the plaintiff received the second injection (Tr. 230, 241, 297).  She reported that her leg pain had returned and that most of her pain was in her leg (Tr. 241).  By October, she reported that injections did not help her at all and that her condition was worsening (Tr. 237).  Treatment notes indicate that she had failed conservative treatment with injections, anti-inflammatories, and physical therapy (Tr. 232, 237).  However, physical examination continued to show full range of motion in her hips, no asymmetry or atrophy, full muscle strength, intact reflexes, and normal pulses (Tr. 233).  In treatment notes dated October 7, 2004, Dr. Strohmeyer stated that the EMG appeared to show that the plaintiff has an S1 radiculopathy and that she may have a "far lateral disk at L5-S1."  His plan was to try a nerve block (Tr. 239).

On October 19, 2004, Dr. Strohmeyer's noted indicate that the plaintiff's pain had worsened and that an injection performed on October 11th had not helped her.  The plaintiff decided to proceed with surgery at this point (Tr. 237).

On November 3, 2004, the plaintiff had a spinal fusion surgery (Tr. 234).  Two weeks later, on November 16th, her x-rays "look[ed] perfect," and she had no leg pain and only "some minimal back pain" (Tr. 236).

On December 14, 2004, at her appointment with Dr. Strohmeyer, the plaintiff was "doing great" and had improved since November.  She was "feeling ok" but reported some occasional pain or soreness with sitting for long periods of time.  Dr. Strohmeyer ordered her to stay out of work to limit her sitting (Tr. 235).

The plaintiff's condition remained the same in January 2005 when she reported some pain in her right buttock; that pain was not "true radicular pain."  The plaintiff

6

was "doing fine," and her x-rays continued to look "perfect." She started physical therapy (Tr. 229).

At an appointment on February 24, 2005, the plaintiff reported that her right hip was bothering her, but that she was "doing well." Treatment notes indicate that she was neurologically intact, and Dr. Strohmeyer suggested that her hip pain may have been related to her S1 joint. The plaintiff was told to return in three months (Tr. 228).

In May 2005, the plaintiff's condition had remained the same since February. She continued to report pain in her buttocks and reported occasional muscle spasms. Her x-rays continued to look good, and pain on her right side was not radicular. She continued participating in physical therapy. Treatment notes indicate that the plaintiff's job had "switched to Charleston and she [was] not going to be able to drive that far."[3] The plaintiff was told to return in six months (Tr. 227).

On November 10, 2005, Dr. Strohmeyer wrote a letter indicating that the plaintiff had "been left with permanent restrictions [and] should not be forced to sit more than two hours at any one time without some stretching." He also indicated that she should not drive for more than 30 or 45 minutes without an opportunity to stretch. Dr. Strohmeyer opined that the plaintiff should limit her lifting to less than 20 pounds and should not climb ladders, work at heights, work overhead, bend, stoop, squat, or crawl (Tr. 222). Dr. Strohmeyer's treatment notes from that month indicate that, despite some pain with prolonged sitting, standing, or driving, the plaintiff was "doing fine," "doing well," and "manag[ing] ok" (Tr. 223, 225). The plaintiff was participating in an exercise program (Tr. 223).

---

[3] At the administrative hearing, the plaintiff reported that she had not worked since August 3, 2004 (Tr. 33). It is unclear whether this treatment note suggests that she was working in May 2005 when her job relocated.

7

There appear to be no additional treatment notes from Dr. Strohmeyer until November 2006 (Tr. 217, 218). The plaintiff visited Dr. Andrea Hucks, a primary care physician, twice between November 2005 and November 2006. On January 27, 2006, after a "fairly lengthy hiatus from [Dr. Hucks'] clinic," the plaintiff reported that her right hip was giving her "fits." The plaintiff had completed physical therapy and was continuing exercises at home. She was also treating her pain with Vicodin (Tr. 329-30). On August 21, 2006, the plaintiff reported to Dr. Hucks that she was "doing fairly well." She continued using pain relievers but was not using anti-inflammatories on a regular basis (Tr. 327).

The plaintiff returned to Dr. Strohmeyer on November 28, 2006, and reported that her right leg was bothering her; Dr. Strohmeyer indicated that she was experiencing S1 radiculopathy in her right leg, similar to what she was experiencing before her operation. However, the plaintiff also reported being "very active" and having lost 30 pounds. A physical exam was "benign," showing that the plaintiff had the ability to toe and heel walk, had no asymmetry or atrophy, had no gross sensory deficit, had full muscle strength, had intact reflexes and normal pulses, and had normal alignment of her spine. Based on normal x-rays, Dr. Strohmeyer recommended treatment with medication (Tr. 217-19).

On February 1, 2007, at a visit with Dr. Hucks, the plaintiff complained of experiencing hip pain, possibly attributable to the cold weather. The plaintiff described her hip pain as feeling like "her 'hip is in a vice'" at times. She stated that her pain traveled down her right lower leg. Dr. Hucks commended the plaintiff during this visit for losing approximately 33 pounds over the past four to five months. The plaintiff experienced some pain management with a trial of Lyrica. The plaintiff reported that her pain was better with rest, but worse with driving. Treatment notes indicate that Vicodin "help[ed] alleviate her symptoms" (Tr. 325).

8

In a statement dated March 28, 2007, Dr. Strohmeyer opined that the plaintiff had been disabled since he started treating her in November 2005[4] (Tr. 212).

On April 18, 2007, Dr. Stohmeyer's treatment notes indicate ongoing buttock and leg pain on the plaintiff's right side; the plaintiff reported that it made it difficult to sit or lie down on her right side.  X-rays showed "nice fusion and nice bone".  Physical examination revealed that, despite tenderness, the plaintiff had normal range of motion, no guarding behavior, an ability to toe and heel walk, normal pulses, and intact reflexes.  Dr. Strohmeyer planned to inject her bursa and told her to continue stretching exercises.  Lyrica had been helping with her pain (Tr. 213-14).

On July 16, 2007, the plaintiff complained to Dr. Hucks of some "emotional lability" including crying spells, increased irritability, and trouble sleeping.  She also mentioned her hip pain during this visit (Tr. 323-24).  On July 18, 2007, the plaintiff returned to Dr. Strohmeyer and reported increased hip pain after an injection had reduced her pain for three weeks.  She was given another injection (Tr. 211).  The plaintiff reported that she was "doing fairly well" and that hip injections had "helped significantly in the past" (Tr. 323).

On January 14, 2008, the plaintiff complained to Dr. Hucks of continued problems with chronic back pain. The plaintiff indicated to Dr. Hucks that Dr. Strohmeyer had mentioned the possibility of the plaintiff seeing a pain management specialist.  Dr. Hucks recommended Dr. Karen Eller and refilled the plaintiff's prescription for Vicodin (Tr. 321-22).

On April 9, 2008, the plaintiff saw Dr. Eller and reported continuous pain and numbness down her right leg (Tr. 358).  Rest and sitting improved her symptoms; standing and driving aggravated her pain.  The plaintiff reported that physical therapy and Lyrica did

---

[4]  The record contains treatment notes from Dr. Strohmeyer dating back to August 2004 (Tr. 243).  It is unclear why Dr. Strohmeyer suggested that he began treating her in November 2005 – over a year later.  The ALJ assumed that this was a typographical error and perhaps meant to refer to the November 2004 surgery (Tr. 18).

not help her, but that epidural injections and Vicodin helped manage her pain (Tr. 358). Physical examination showed no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 358-59). The plaintiff reported joint pain and diffuse tenderness in her back. Dr. Eller ordered an MRI, which was performed on April 15, 2008 (Tr. 359). The MRI showed post-surgical changes at L5-S1 as well as an "eccentric diffuse disk bulge at L4-5 with a moderate canal narrowing, occasioned both by disk bulge and ligamentum flavum hypertrophy. Disk bulge eccentric towards left at L4-5. Mild disk bulge at L3-4 and L1-2 as described" (Tr. 283).

On April 30, 2008, Dr. Eller assessed the plaintiff as having lumbar radiculopathy, lumbar post laminectomy syndrome, and facet arthropathy/syndrome. Dr. Eller noted that she "discussed the correlation of the patient's pain with the anatomic studies" as well as the "potential need for Radiofrequency Ablation in the future for more definitive therapy" (Tr. 360-61).

On May 14, 2008, the plaintiff reported to Dr. Hucks that "the treatments are helping" and that her "legs [felt] a lot better." She stated that standing for too long often limited her activities (Tr. 319).

On May 20, 2008, the plaintiff returned to Dr. Eller with continued complaints of pain. The plaintiff rated her average pain as a six on a ten-point scale. She described the pain as feeling "like someone kicked me" and she had trouble sleeping. Physical examination continued to show no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 356). Dr. Eller administered another injection (Tr. 357)..

On July 21, 2008, the plaintiff began reporting total body pain radiating to all of her joints; she rated the pain as an eight to nine on a ten-point scale. She requested additional Neurontin. Physical examination showed no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 354).

The plaintiff had similar complaints during a visit to Dr. Eller on September 10, 2008, but noted improvement with hydrocodone, stretching, and walking. She reported eight-or-nine-out-of-ten pain but admitted that she had "over exerted herself a couple of times." She described the pain as feeling "like a knuckle is being bored into her back" and her sleep was poor (Tr. 352). Dr. Eller diagnosed the plaintiff with lumbar radiculopathy, lumbar post-laminectomy syndrome, facet arthropathy/syndrome, and sacroliitis and ordered a sacroiliac joint injection (Tr. 352-53).

The plaintiff saw Dr. Hucks on September 19, 2008, with complaints of upper extremity pain in her elbows bilaterally and also in her hands. Dr. Hucks assessed this as being possible tendinitis, early arthritis and prescribed Relafen (Tr. 317-18).

On September 29, 2008, the plaintiff reported pain in her lower back and right leg (Tr. 350). Physical examination showed no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 350, 352). Neurontin was "really help[ing] with the symptoms in her legs" (Tr. 317). The plaintiff underwent a sacroiliac joint injection during this visit (Tr. 351).

On October 28, 2008, the plaintiff saw Dr. Eller and noted an improvement in her back pain following the injection. The plaintiff was able to walk more and sweep her kitchen. She also reported that she had driven from Baton Rouge to South Carolina.

Physical examination continued to show no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 348).  The plaintiff underwent a lumbar transforaminal epidural steroid injection (Tr. 349).

On November 25, 2008, the plaintiff reported to Dr. Eller increased pain because she had over-exerted herself doing yard work.  An injection had helped her right side "a lot."  She was given another injection on the left side.  Physical examination showed no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 344-45).  The plaintiff tolerated her medication without difficulty or side effects (Tr. 346).

Treatment notes continued to indicate that the plaintiff tolerated her medication in January 2009 through May 2009 (Tr. 209, 336-37, 340, 342).  The plaintiff continued receiving injections (Tr. 208, 315).

On March 3, 2009, the plaintiff saw Dr. Eller for pain and received an injection. She noted that Vicodin helped her pain.  She reported increased symptoms when being on her feet too long, doing housework, or bending.  Physical examination showed no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 207-08).

On June 10, 2009, the plaintiff received another injection from Dr. Eller and complained of lower back pain with radiation down the bilateral lower extremities through her toes.  The plaintiff again reported eight-out-of-ten pain, but noted improvement in symptoms with medication or sitting in a recliner.  She reported that her March injection had "helped a lot".  Physical examination continued to show no joint swelling, no muscle

weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 205).

In August 2009, Dr. Joseph Gonzalez, M.D., reviewed the available evidence on behalf of the state agency and opined that the plaintiff could occasionally lift 20 pounds; frequently lift ten pounds; stand and walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; and only occasionally operate foot controls with her right leg. He noted that she could frequently use car pedals, however (Tr. 382). Dr. Gonzalez indicated that the plaintiff could never climb ladders, ropes, or scaffolds, but that she could occasionally perform all other postural activities (Tr. 383). He indicated that she should avoid concentrated exposure to hazards (Tr. 385). Dr. Gonzalez noted that the plaintiff's allegations of pain were only partially credible based on the results of x-rays and physical examination; he also indicated that Dr. Strohmeyer's November 2005 opinion was no longer applicable because it was inconsistent with current physical examinations (Tr. 386).

The plaintiff continued tolerating her medication in late 2009 (Tr. 332, 398, 405). In September 2009, the plaintiff rated her average pain as a five-out-of-ten. She reported improvement in her symptoms when elevating her legs or with the use of Vicodin. She also experienced two months of relief after her most recent injection (Tr. 402). Physical examination showed no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests. She received another sacroiliac joint injection (Tr. 403).

In November 2009, the plaintiff was "doing fairly well" despite reporting increased problems with her back (Tr. 410).

On December 7, 2009, the plaintiff saw Dr. Eller again and described her average pain as a nine-out-of-ten despite reporting improved symptoms with medication, including a Lidoderm patch. She also reported temporary but "good relief" with injections. Physical examination again showed no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 396).

The plaintiff continued tolerating her medication without reported side effects throughout 2010 (Tr. 394-95). She continued reporting relief with injections (Tr. 392, 408).

The plaintiff complained to Dr. Eller of lower back pain with radiation to her right buttock in March 2010. Physical examination showed no joint swelling, no muscle weakness, normal gait, normal muscle strength, normal muscle tone, normal sensation, full motor strength, normal deep tendon reflexes, intact sensation, no obvious muscle spasms, and negative straight-leg raise tests (Tr. 392). The plaintiff also reported that "[a]ll-in-all she [was] doing fairly well" in March and November 2010 (Tr. 408, 439). In July 2010, the plaintiff started using Voltaren gel, which "work[ed] great for her." She stated that she was "very pleased with the results." The Voltaren gel was working so well that the plaintiff began using Lidoderm patches less frequently (Tr. 451).

Dr. Hugh M. Wilson, M.D., reviewed the available evidence on behalf of the state agency in April 2010. He essentially concurred with Dr. Gonzalez's findings (Tr. 432-37). He also noted that Dr. Strohmeyer's opinion was discounted because it was a conclusory opinion on an issue reserved for the Commissioner (Tr. 437).

On March 16, 2011, Dr. Eller completed a Multiple Impairment Questionnaire regarding the plaintiff's limitations (Tr. 445-50). Dr. Eller stated on page one of the questionnaire that the plaintiff "will likely have chronic pain her entire life." She went on to describe the plaintiff's primary symptoms as being severe pain in coccyx, left lower back

14

down right lower extremity, imbalance, poor sleep, and numbness in her right lower extremity. Dr. Eller estimated that the plaintiff's level of pain was approximately an eight out of ten and that her fatigue was approximately a three out of ten. Dr. Eller also noted that she had been unable to completely relieve the plaintiff's pain with medication without unacceptable side effects (Tr. 445-46).

Dr. Eller reported that the plaintiff experienced continuous mechanical and neuropathic pain in her lower back and right leg without complete relief (Tr. 446). She opined that the plaintiff could only sit for two hours out of an eight-hour workday; stand for up to one hour out of an eight-hour workday; and sit only with frequent breaks every 15 minutes. She opined that the plaintiff could occasionally lift 20 pounds and frequently lift ten pounds (Tr. 447). Dr. Eller suggested that the plaintiff's symptoms would increase in a competitive work environment and that her symptoms would frequently interfere with her ability to concentrate (Tr. 448-49). Dr. Eller believed that the plaintiff was capable of a low stress job, but that she would be absent for work two or three days each month. Dr. Eller opined that the plaintiff could not stoop, push or pull, kneel, or bend (Tr. 449-50).

The plaintiff continued reporting pain in April 2011 and began using a cane for long walks or when outside despite having a normal gait. She reported "pretty good relief" and noted over a month of relief with injections. Physical examination showed normal gait, normal muscle strength, normal muscle tone, and normal sensation (Tr. 485).

The plaintiff had similar complaints in June 2011, but physical examination remained the same. The plaintiff reported no side effects to her medication (Tr. 481). In September 2011, the plaintiff was staying "relatively active" (Tr. 474). Her complaints remained consistent through the end of 2011 (Tr. 467, 469, 471). In November, treatment notes indicated three months of ongoing relief from an injection, "reasonable pain relief" without side effects of medication, and that the plaintiff remained "relatively active" (Tr. 469). The plaintiff continued to tolerate her medication in early 2012 (Tr. 463, 465).

At the administrative hearing, the plaintiff testified that she was never pain free. She reported that injections help manage her pain and that it makes her pain "tolerable" and enables her to "get by" (Tr. 34-35). As for her medications, the plaintiff reported that Neurontin helps with her leg pain, but that it causes balance problems and makes her groggy (Tr. 36). The plaintiff indicated that her pain was typically an eight or nine out of ten without medication and a five or six out of ten with medication (Tr. 44).

The plaintiff testified that she spends most of her day sitting in a recliner with her feet elevated and that she gets up to move around (Tr. 37, 39-40). She reported that she tries to keep as active as possible. The plaintiff told the ALJ that she needs to get up from sitting after "maybe 15 minutes" to walk around (Tr. 38-39). She reported that she can stand for about ten minutes and that she walks around her driveway several times per day (Tr. 39). She also reported that she uses hiking poles to walk at Dr. Eller's suggestion, even though they were not prescribed (Tr. 41).

The plaintiff lives by herself and is capable of performing self-care activities (Tr. 43). She reported going into town three times a week. While she reported being capable of dusting her house, the plaintiff testified that she has friends that come help her clean her house and that they do the sweeping, mopping, and vacuuming (Tr. 37).

Kristen Cicero, a vocational expert, testified at the administrative hearing. The ALJ asked the vocational expert to consider a hypothetical individual with the plaintiff's vocational profile who was capable of performing a range of light work, except that the individual would need to have the option to sit or stand as needed; could only occasionally climb stairs, stoop, kneel, crouch, or crawl; could never climb ladders; could frequently balance with an assistive device for prolonged walking; and should avoid unprotected heights. The vocational expert testified that such an individual could perform the plaintiff's past relevant work as a dispatcher. If the individual was further limited to performing only sedentary work, it would not change the result, and she could work as a dispatcher (Tr. 48).

In response to questions asked by the plaintiff's representative, the vocational expert testified that the individual would be unable to work if she could not sustain full-time work or if she could only sit for two hours and stand or walk for one hour (Tr. 49). Furthermore, if the individual needed to walk around for five minutes every 15 minutes or had frequent loss of concentration, she would be unable to work (Tr. 50).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) finding that she was not credible; (2) failing to follow the treating physician rule; (3) failing to perform the requisite function-by-function analysis in determining her residual functional capacity ("RFC"); and (4) finding that she could perform her past relevant work.

### *Credibility*

The plaintiff first argues that the ALJ erred in finding that she was not credible (pl. brief 10-11).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that

17

it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> > While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4ᵗʰ Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with

18

objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

    (1)    the individual's daily activities;

    (2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

    (3)    factors that precipitate and aggravate the symptoms;

    (4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

    (5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

    (6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

    (7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. § 404.1529(c).

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not fully

credible to the extent they were inconsistent with the RFC assessment (Tr. 17).  In making the credibility assessment, the ALJ cited the lack of objective medical evidence supporting the plaintiff's statements, inconsistencies in the record, and the plaintiff's daily activities (Tr. 20).  The ALJ noted (Tr. 18-19) that treatment records indicated that the plaintiff's back pain was responsive to pain management, including injections and medication (Neurontin) (*see* Tr. 34-36, 205, 207, 211, 317, 319, 323, 325, 358, 392, 396, 402, 408, 451, 467, 469, 485). The ALJ further noted that while the plaintiff testified that her pain medication caused her to feel off balance and "high" (*see* Tr. 36, 44), there was no evidence that she made any such complaints to Dr. Eller (Tr. 19).  Treatment notes show that the plaintiff tolerated her medication without difficulty or side effect (Tr. 209, 335, 340, 342, 346, 394, 395, 398, 405, 463, 465, 469, 477, 479, 481, 483, 488).  Furthermore, the ALJ noted (Tr. 18) that the plaintiff testified that she does not drive more than four miles at a time (*see* Tr. 37); however, the evidence showed that she had made a thousand mile drive since the alleged disability onset date (*see* Tr. 348 (treatment note from October 2008 stating the plaintiff drove from Baton Rouge to South Carolina)).  Moreover, while the plaintiff testified that she no longer does yard work, Dr. Eller's treatment notes showed that the plaintiff was doing yard work in November 2008 (*see* Tr. 344), more than four years after her alleged onset date.  The ALJ also cited the plaintiff's activities of daily living, which included driving, shopping alone, reading, watching television, playing on the computer, doing laundry, sweeping, and preparing simple meals, in support of the credibility finding (Tr. 19).

The plaintiff does not challenge the reasons offered by the ALJ in discounting her credibility.  Instead, she argues that the ALJ erred in failing to consider her 18 year work record.  However, while a plaintiff's work history may be a factor supporting credibility, it is not dispositive.  *See* SSR 96–7p, 1996 WL 374186, at *5 (finding that a credibility assessment "must be based on consideration of all the evidence in the case record," which "includes, but is not limited to" a claimant's "prior work record and efforts to work").  Because

20

a claimant's work history is not a controlling factor in assessing credibility and the ALJ offered several reasons for discounting the plaintiff's credibility, the undersigned concludes that the ALJ did not err in failing to assign her substantial credibility due to her work record. To the extent the ALJ erred in failing to discuss the plaintiff's work history in his credibility assessment, the undersigned recommends finding that any such error was harmless as the ALJ cited several factors in his credibility analysis, and adding this single factor would not have changed the outcome. *See Jones v. Colvin*, No. 1:12-2894-TMC, 2013 WL 5883382, at *12 (D.S.C. Oct. 30, 2013) (finding ALJ did not err in failing to assign great weight to claimant's work history).

Here, the ALJ properly discredited the plaintiff's subjective complaints of disabling pain.  Further, the ALJ considered the relevant factors and satisfied her burden of explaining her determination.  Substantial evidence supports the determination, and this court finds no merit to this assignment of error.

### Treating Physician

The plaintiff next argues that the ALJ erred in failing to follow the treating physician rule (pl. brief 11).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2)  the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

21

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

Here, the plaintiff argues, "[T]here does not exist persuasive contradictory evidence to rebut the opinions of Dr. Strohmeyer and Dr. Eller that [the plaintiff] is disabled" (pl. brief 11).

On November 10, 2005, Dr. Strohmeyer, wrote a letter indicating that the plaintiff had "been left with permanent restrictions [and] should not be forced to sit more than two hours at any one time without some stretching." He also indicated that she should not drive for more than 30 or 45 minutes without an opportunity to stretch. Dr. Strohmeyer opined that the plaintiff should limit her lifting to less than 20 pounds and should not climb ladders, work at heights, work overhead, bend, stoop, squat, or crawl (Tr. 222). In a statement dated March 28, 2007, Dr. Strohmeyer opined that the plaintiff had been disabled since he started treating her in November 2005 (Tr. 212).

The ALJ considered both of Dr. Strohmeyer's opinions and noted that Dr. Strohmeyer did not place additional limitations on the plaintiff in March 2007. Thus, the ALJ

22

found that Dr. Strohmeyer intended for the permanent restrictions he placed on the plaintiff in November 2005 to stand.  The ALJ accommodated many of the restrictions in the RFC (weight lifting limit, sit/stand option, never climb ladders or be exposed to unprotected heights) but found that the restrictions did not support a finding of complete disability (Tr. 19).

On March 16, 2011, Dr. Eller completed a Multiple Impairment Questionnaire regarding the plaintiff's limitations (Tr. 445-50).  Dr. Eller stated on page one of the questionnaire that the plaintiff "will likely have chronic pain her entire life."  Dr. Eller estimated that the plaintiff's level of pain was approximately an eight out of ten and that her fatigue was approximately a three out of ten (Tr. 446).  She opined that the plaintiff could only sit for two hours out of an eight-hour workday; stand for up to one hour out of an eight-hour workday; and sit only with frequent breaks every 15 minutes.  She opined that the plaintiff could occasionally lift 20 pounds and frequently lift ten pounds (Tr. 447).  Dr. Eller suggested that the plaintiff's symptoms would increase in a competitive work environment and that her symptoms would frequently interfere with her ability to concentrate (Tr. 448-49).  Dr. Eller believed that the plaintiff was capable of a low stress job, but that she would be absent for work two or three days each month.  Dr. Eller opined that the plaintiff could not stoop, push or pull, kneel, or bend (Tr. 449-50).

The ALJ gave "less than controlling weight" to Dr. Eller's opinion that the plaintiff was not capable of sitting more than a total of two hours a day or standing and walking more than a total of one hour a day (Tr. 19).  The ALJ noted that Dr. Eller's own examinations failed to place restrictions on the plaintiff's physical activities, and treatment notes showed that the plaintiff responded well to pain management and enjoyed an active lifestyle (Tr. 19-20; *see* Tr. 34-35, 36, 205, 207, 211, 317, 319, 323, 325, 358, 392, 396, 402, 408, 451, 467, 469, 485).  The ALJ also stated that treatment notes did not support the limitations imposed by Dr. Eller (Tr. 20).  Physical examinations routinely documented

23

normal mechanical functioning (Tr. 205, 207-08, 213, 217, 218, 344, 348, 350, 352, 354, 356, 358-59, 360, 392, 396, 402-03, 460, 467, 469, 474, 481, 485).  The ALJ also noted that, prior to giving her opinion in March 2011, Dr. Eller's last treatment note was from March 2010.  The ALJ found that the lack of treatment notes for the last year also rendered Dr. Eller's opinion less persuasive.

The ALJ also gave "significant weight" to the opinions of the State agency medical consultants (Tr. 20).  Specifically, in August 2009, Dr. Gonzalez reviewed the available evidence on behalf of the state agency and opined that the plaintiff could occasionally lift 20 pounds; frequently lift ten pounds; stand and walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; and only occasionally operate foot controls with her right leg.  He noted that she could frequently use car pedals, however (Tr. 382).  Dr. Gonzalez indicated that the plaintiff could never climb ladders, ropes, or scaffolds, but that she could occasionally perform all other postural activities (Tr. 383). He indicated that she should avoid concentrated exposure to hazards (Tr. 385).  Dr. Gonzalez also indicated that Dr. Strohmeyer's November 2005 opinion was no longer applicable because it was inconsistent with current physical examinations (Tr. 386). Similarly, in April 2010, Dr. Wilson essentially concurred with Dr. Gonzalez's findings (Tr. 432-37).  Dr. Wilson reported that Dr. Strohmeyer's November 2005 opinion was not current, given recent treatment, and therefore only partially credible, and his March 2007 opinion was on an issue reserved for the Commissioner (Tr. 437).

While the plaintiff argues in a conclusory fashion that the ALJ must give "great weight" to a treating physician's opinion unless there is "persuasive contradictory evidence to rebut it" (pl. brief 11 (citing *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987)), this is a "defunct legal standard." *Brown v. Astrue*, No. CBD-10-1238, 2013 WL 937549, at *4 (D. Md. Mar. 8, 2013).  The current legal standard is contained in 20 C.F.R. § 404.1527(c)(2) (2012), which provides, in pertinent part: "If we find that a treating source's opinion on the

24

issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." Moreover, if the treating physician's opinion is not entitled to controlling weight, the ALJ should apply the factors described above to determine its proper weight. *See* 20 C.F.R. § 404.1527(c)(1)-(5).

Based upon the foregoing, the undersigned finds that the ALJ properly considered the opinions of the treating physicians, and substantial evidence supports the finding that they were not entitled to controlling weight. Accordingly, this assignment of error is without merit.

### *Residual Functional Capacity*

The plaintiff argues that the ALJ's erred in the RFC determination by failing to perform the required function-by-function analysis (pl. brief 11-12). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material

> inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Here, the ALJ found that the plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b),[5] with the exception that she needed to sit and stand at will as part of her job duties, required the use of an assistance device for prolonged walking, could occasionally climb stairs, stoop, kneel, crouch or crawl, and could never climb ladders or be exposed to unprotected heights (Tr. 16).

The plaintiff argues that because the ALJ did not "perform the requisite function-by-function assessment, it cannot legitimately be said that [the] RFC determination was based on substantial evidence" (pl. brief 12). As set forth above, the ALJ found the plaintiff had the RFC to perform light work as defined by the regulations, with the exception of the specific limits she articulated (Tr. 16). The regulations define light work as follows:

> Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional

---

[5]In another part of the opinion, the ALJ described the plaintiff's RFC as being limited to lifting and carrying up to 20 pounds occasionally and ten pounds frequently, along with the other limitations set forth above (Tr. 20).

limiting factors such as loss of fine dexterity or inability to sit for
long periods of time.

20 C.F.R. § 404.1567(b).

In *Bennett v. Astrue*, the court considered the issue of whether the ALJ violated SSR 96-8p because the RFC findings were not sufficiently detailed.  C.A. No. 1:10-1931-RMG-SVH, 2011 WL 2470084, at *13-15 (D.S.C. May 31, 2011), *adopted by* 2011 WL 2470070, at *2-3 (D.S.C. June 20, 2011).  In that case, the ALJ similarly found the plaintiff had the RFC to perform light work with certain other limitations.  Like the plaintiff here (pl. brief 12), the plaintiff in *Bennett* relied on *Vo v. Astrue*, in which the court remanded for a function-by-function assessment because the matter was already being remanded for other reasons.  *See Vo*, 518 F.Supp.2d 715, 731 (D.S.C. 2007).   Notably, the court in *Vo* suggested that failure to perform such detailed analysis could be harmless error.  *Id.*  The court in *Bennett* noted that no Fourth Circuit case had considered the issue of how much written detail an ALJ's decision must include in analyzing a claimant's RFC prior to determining what work he or she may perform.  *Bennett*, 2011 WL 2470084, at *14.  The court found the allegation of error to be without merit, finding that "RFC determinations may contain implicit findings, including a finding regarding lifting, sitting, standing, and walking." *Id.* at *15 (citing *Hines v. Barnhart,*453 F.3d 559, 563 (4th Cir. 2006) ("In light of SSR 96–8p, [the ALJ's] conclusion [that the plaintiff could perform a range of sedentary work] implicitly contained a finding that Mr. Hines physically is able to work an eight hour day."); *Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) (holding that the ALJ implicitly found claimant was not limited in the areas of sitting, standing and walking, when the ALJ specifically addressed in the RFC the functions in which he found a limitation)).

Here, the plaintiff points to no specific limitation that the ALJ failed to include in the RFC.  The undersigned agrees with the Commissioner (def. brief 19-20) that the ALJ's decision complied with SSR 96-8p by providing a detailed discussion of how the evidence

27

supported her conclusions, including a discussion of the plaintiff's testimony and the opinion evidence  (Tr. 16-20).  Furthermore, the ALJ's incorporation of the definition of light work into the RFC provides specific findings with regard to particular functions, such as lifting, carrying, standing, and walking.  Based upon the foregoing, this allegation of error is without merit.

### Past Relevant Work

Lastly, the plaintiff argues that the ALJ found that she could perform her past relevant work "without making any finding as to whether the functions required by her past relevant work were precluded by her impairments" (pl. brief 12).  However, as argued by the Commissioner, at the administrative hearing, the ALJ asked the vocational expert whether an individual with the plaintiff's RFC - or even a more restrictive RFC limiting her to sedentary work - could perform her past relevant work as a dispatcher as it was actually performed by the plaintiff or as generally performed in the national economy(Tr. 48). The vocational expert responded that the plaintiff could perform her past relevant work under either hypothetical question (Tr. 48). The ALJ properly relied on this testimony (Tr. 20). *See* 20 C.F.R. § 404.1560(b)(2) (indicating that an ALJ may "use the services of vocational experts" at step four of the sequential evaluation process to determine whether a claimant's RFC enables her to meet the demands of her past work). Accordingly, based on the vocational expert's  opinion, the ALJ properly found that the plaintiff's impairments did not preclude her from performing the functions required by her past relevant work.  Therefore, this allegation of error is without merit.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.


s/ Kevin F. McDonald
United States Magistrate Judge

April 24, 2014
Greenville, South Carolina